UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHIGAN SUGAR COMPANY,

                    Plaintiff,                  Case Number 06-10160-BC

v.                                        Honorable Thomas L. Ludington

BAKERY, CONFECTIONERY, TOBACCO,
WORKERS AND GRAIN MILLERS,
LOCALS 259-G, 260-G,

                    Defendants.
_____/

## ORDER REJECTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, SUSTAINING PLAINTIFF'S OBJECTIONS, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND VACATING ARBITRATION AWARD

The plaintiff, the Michigan Sugar Company, commenced this action seeking to vacate an arbitration award issued on October 28, 2005, affirming the defendant unions' grievance that the company had wrongfully withheld health care benefits in violation of the parties' collective bargaining agreement during intermittent periods of picketing in August and September of 2004. The defendants have filed a counterclaim and an answer requesting that the Court enforce the arbitrator's decision. This Court's predecessor referred the matter for general case management to Magistrate Judge Charles E. Binder. Thereafter, the parties filed cross motions for summary judgement, and the magistrate judge issued a report on October 20, 2006 recommending that the defendants' motion for summary judgment be granted and the plaintiff's motion be denied.

The plaintiff has filed timely objections to the report and recommendation to which the defendants have responded. The Court heard oral argument on January 17, 2006. After considering the parties' arguments during the hearing and conducting a *de novo* review of the record in light of

the parties' submissions, the Court concludes that the arbitrator's award did not draw its essence from the language of the collective bargaining agreement nor did the magistrate judge's report and recommendation upholding that award. The Court therefore will reject the magistrate judge's report and recommendation, sustain the plaintiff's objections, grant summary judgment in the plaintiff's favor, and vacate the arbitration award.

I.

A.

The plaintiff in this case, the Michigan Sugar Company, produces sugar at facilities it owns in Michigan and Ohio. Operations at the plants generally are divided into two seasons. The "campaign season" occurs when the production facilities receive sugar beets and process them into sugar. The balance of the year is the "inter-campaign" season, and during that period, activities center around packing and shipping the sugar and making any necessary capital improvements. The company's employees belong to local affiliates of defendant Bakery, Confectionary, Tobacco Workers & Grain Millers International Union.

On August 10, 2004, union members in Ohio initiated an economic strike because the company was unable to reach an agreement with one of the Ohio local unions. That same day, Ohio employees set up picket lines at all of the Michigan operations. The following day, the picket lines were removed, but union member set them up again on August 23, 2004. Three days later, the picket lines were removed. Final picketing began on September 7, 2004 and ended on September 9, 2004.

Prior to the picketing, on August 5, 2004, the company sent a letter informing its employees of the status of the union negotiations at the Ohio plant and warning them that an "employee's

-2-

refusal to perform work under these circumstances could result in the immediate **loss of all unaccrued benefits, including health care.**" Michigan workers who participated in the strike, including those that refused to cross picket lines, were denied health coverage for those days during which they refused to cross the picket lines. The parties agree that strikers were provided with appropriate COBRA notices allowing them to continue coverage at their own expense. At least two employees elected to continue coverage at their expense.

As the arbitrator noted in his decision, the International Union is separate signatory to the collective bargaining agreement at issue in this case and played a material role once negotiations broke down in Ohio on August 10, 2004. *See* Dkt # 14, Arbitration Op. & Award at 4. Indeed, the International approved of the Ohio locals vote to strike, and International vice president Mike Konesko accompanied Ohio members to the Michigan facilities, where, as noted above, they established picket lines. *Ibid.* The International Union also paid strike benefits to Michigan workers who respected the picket lines.

B.

Several provisions of the collective bargaining are at issue in this case, and it is necessary to lay them out in some detail for later analysis. First, Article 2 of the agreement specifies the rights of management:

> The company shall retain all rights, powers, and authority it had prior to entering into this Agreement, including, but not limited to the sole right manage its business and direct the working force, subject only to such regulations governing the exercise of these rights as are expressly provided in this Agreement.
>
> The company retains the sole right to suspend, discipline and discharge employees for just cause, subject to the terms and provisions of this agreement.

Dkt # 17, CBA at 4. Second, Article 13 contains a no strike, no lockout provision:

**Section 1.  Strikes and Lockouts Prohibited.**  During the term of the agreement there shall be no cessation of work by employees who are covered by provisions of this Agreement or action of any form taken or permitted by impairing Employer's operations or affecting the distribution of any of its products, except as stated in Article 3, Section 10, nor shall there be any lockout by the employer.

*Id.* at 45.

Third, and somewhat related, Article 3, Section 9 protects employees under certain circumstances because of the activities of "other labor organizations":

a.  **Picket Lines – Other Premises.**  The Company agrees that its employees will not be required under penalty of discharge or discipline of any kind to walk through or cross in any manner any picket line maintained by a labor organization, and any refusal to cross a picket line singly or in concert shall not constitute a breach of this contract.

b.  **Picket Lines – Employer Premises.**  The Company further agrees that in the event of any picket line by any labor organization placed around the front of any entrance to its premises, it will not require its employees under penalty of discharge or discipline of any kind to walk through or cross said picket line in any manner said picket line, and any refusal to cross a picket line singly or in concert shall not constitute a breach of this contract.

c.  **Remedies for Breach**.  It is further agreed that in the event of any violation of these provisions by the Company, an individual employee affected by such violation shall have the right to maintain an action at law or equity in the courts to redress any injuries suffered thereby, in addition to any other provisions in this Agreement for redress of grievance.

*Id.* at 7.  Finally, Article 14 governs the issue of health care benefits and their termination:

**ARTICLE 14 Insurance**
. . .

**Section 2.  Hospital-Medical -Surgical-Dental Benefits – Insurance**

a.  Hospital-Medical-Surgical.  Employer agrees to assume the full cost of Hospital-Medical-Surgical Benefits – Insurance described below for regular employees and their dependents and pensioners and their dependents, to be insured as soon as practicable through Blue Cross-Blue Shield of Michigan or its BC-BS Preferred Plan or PPOM Option Plan 250.

. . .

-4-

**Section 4.  Termination of Insurance.**

a.    Layoff.  In the event a regular employee is laid off for longer than a six (6) month period the Employer's responsibility to assume their cost of the above benefit shall cease; however, this does not prevent the employee from continuing to pay for this insurance through the group plan.

b.    Termination of Employment.  In the event of termination of employment other than normal layoff or retirement with pension, an employee's hospitalization, surgical and medical coverage and life insurance under the group arrangement shall be cancelled in thirty (30) days, unless continued under Subsection c. of Section 2, above.

*Id.* at 52

## C.

Ultimately, the defendants filed a grievance against the company to recover the lost health care benefits.  Pursuant to the terms of the collective bargaining agreement, the matter proceeded to arbitration on April 4, 2005.  Arbitrator Mario Chisesa rendered a decision on October 28, 2005, in which he found that the company had improperly denied health coverage to employees refusing to cross the picket line.  His opinion reads, in relevant part:

As I indicated, the parties have focused on a number of provisions of the Collective Bargaining Agreement.  Collective Bargaining Agreements should be read as a whole with every provision given meaning.  Parties don't place words and provisions in an agreement intending that they be ignored.

Article 13 - Prohibition of Strikes and Lockouts, specifically Section 1, prohibits any cessation of work, including lockouts.  The only stated exception . . . references Article 3, Section 10[.] That provision allows employees the right to strike if the Employer refuses to abide by the decision of an arbitrator.  It is interesting . . . that . . . Article 13 does not create an exception for the activities preserved under Section 9 of Article 3 which references employees' protections when they refuse to cross appropriate picket lines.  Perhaps the parties felt the refusal to cross a picket line wasn't a strike, and, thus, didn't need to be listed as a named exception for the application of the no-strike language.  Whatever the case, the fact is that the mutual intent of the parties protects employees who fail to cross pick lines in accordance with Section 9 of Article 3.  In reality it protects employees from the application of

-5-

the no-strike provision if the failure to cross a picket line is a strike.
. . .

The impact of that conclusion [that Article 13 prohibits sympathy strikes] establishes that the parties have agreed by contract that individuals who engage in work cessation in violation of Section 1 of Article 13, have violated the Collective Bargaining Agreement and, as a result, are subject to the disciplinary consideration in the contract.

The Employer has also suggested that the fact the picketing involved was intermittent violates the National Labor Relations Act. . . . My understanding is that such picketing is not protected under the Act. Thus, as a result and as I understand the Board's viewpoint, employees could be subject to discipline for engaging in that activity.

However, the above is a recital of the law and not necessarily the protection offered by the Collective Bargaining Agreement. Furthermore, depending on how the question of what is the union or labor organization in this case is answered, the impact of the rulings regarding intermittent picketing could be confined in application only to the Ohio Strikers. . . . [It] is not pivotal in the resolution of this case.

The Employer has argued that there is well settled law that it doesn't need to support or finance a strike or sympathy strike by maintaining wages, insurance benefits, etc. I agree with the general proposition by the Employer. However, as most general propositions go, there may be specific understandings that alter the landscape.

One of those provisions . . . is Section 4 of Article 14 - <u>Insurance</u>.

[T]o quickly summarize, it establishes that if a regular employee is laid off, the Employer will assume the cost of the benefit for a six-month period. At the end of six months the employee can pay for the insurance through the group plan. The second paragraph, and the one most pertinent to this dispute, concerns "termination of employment." The language provides that except in circumstances involving a "normal layoff or retirement with pension," an employee's hospitalization, etc, shall be cancelled in 30 days unless it is continued under paragraph c of Section 2. As I read [that provision] it does not apply to this dispute. However, the language dealing with the continuation of insurance for a 30-day period, and that's how I construe it, does, in my view, have application in this dispute. The term "termination of employment" can be construed narrowly to mean discharge, resignation of employment or other events which lead to the classically understood termination of employment which completely severs all aspects of the employee/employer relationship. However, it could also be interpreted in a broader sense to mean that employees are not working, but yet have some relationship with the Employer, will

-6-

not have their coverage cancelled until 30 days have passed. . . . I assume . . . that even if an individual were terminated for cause, their insurance would continue for at least 30 days. There are other provisions of the agreement which speak of insurance, but they generally do so in relation to specific concerns . . . .[T]here is no specific reference to termination of insurance.

. . .

Given the above . . . it would be entirely appropriate to conclude that even if the Employer's position regarding the scope of the language in Section 9 of Article 3 was correct, and even if the termination of health insurance was not considered discipline, the existence of the language in paragraph b of Section 4 of Article 14 expresses the mutual intent of the parties that employees will have a minimum of 30 days of paid health insurance under any circumstances that could arguably fall within the definition of termination of employment.

Since that's the case, and it appears from the record that even an employee who engaged in severe misconduct, such as striking a supervisor or theft, it logically follows that the circumstances the current greivants found themselves in, qualified for at least a continuation of insurance for 30 days. Some have suggested that the language in question prohibits a termination of insurance until that point that employees suffer a classic termination of employment such as a discharge, and thus insurance coverage for the grievants should continue indefinitely because there has been no termination of employment. However, given the totality of the circumstances and the contract language, I am not prepared to reach that conclusion. The grievants are still employees even though they have honored the picket lines in questions. Employees, such as the grievants, are entitled to health insurance coverage. Absent contract language, the Employer may have had the right to withhold the benefit. However, Section 4 of the Article 14 redefines the relationship regarding the termination of this benefit. Based on this record, I am persuaded that the intent of the parties, as expressed by the language in question, established that individuals who engage in the activity the grievants have in this case fall within the protection of paragraph b of Section 4 of Article 14.

This brings us to the consideration of the language in Section 9 of Article 3. Given the above findings, it could be argued that the issues regarding Section 9 are moot. However, . . . I will address the language in question.

First of all, the term "other labor organizations" is contained in the caption of Section 9, and in my view, must be considered and interpreted as any other language in the contract. . . . I am persuaded that the language "Other Labor Organizations" was utilized by the parties to define an aspect of their relationship and thus must be recognized and given meaning.

As suggested, the Employer argues that the protection afforded by Section 9 does no apply to the current employees because the activities in question; in other

words, the picketing at the Michigan plants, was not carried out by "Other Labor Organizations."

Of course, there is language in paragraph b of Section 9 which recognizes that employees need not cross any picket line by "any labor organization." This language must be read in harmony with the language regarding "other labor organizations."

In general, I agree with the Employer's proposition that the protection of Section 9 relates to other labor organizations. The question then becomes whether the Ohio Locals are "Other Labor Organizations." Before getting to that resolution, I do wish address the Employer's concern that if I find that the Ohio Local is a different labor organization, it would follow that each of the Locals covered by this contract were different labor organizations and thus there would be a situation where someone from a different plant could picket and thus prohibit employees from working at another Michigan plant. However, I can't adopt the Employer's fears because I am convinced that all of the Michigan Locals are considered one labor organization for the purpose of applying the language in Section 9 of Article 3. . . . My reasoning is simply that all of the Michigan Locals and the International have chosen, and obviously along with the Employer to be covered by one Collective Bargaining Agreement. They have agreed that they will be collectively referred to as the Union.
. . .
However, I am not persuaded that such conclusion applies to the Ohio Local. The contract involving Local 294-G clearly relates that the Local is "affiliated" with the International Union. Of course, the International Union is affiliated with the ALF-CIO and the CLC. I don't think that affiliation would mean any union affiliated with ALF-CIO and the CLC would be disqualified from being another labor organization under . . . the contract. In reality, it is apparent that the same International Union is involved with the Ohio Locals and the Michigan Locals. Yet it is difficult, if not impossible, to conclude that as a result of that reality, the Ohio Locals and the Michigan Locals should be considered the same labor organization. . . . [E]ven though an organization as it exists [might fit the] definition of labor organization as it exists under the Labor/Management Reporting and Disclosure Act of 1959, the real question is what does the term "labor organizations" mean under the Collective Bargaining Agreement.

[E]ven though affiliated with the same International as the Michigan Locals, [the Ohio Local] is indeed a different labor organization . . . . This conclusion would be quite different if the record established that . . . the International was the Union and Locals were nothing more than powerless agents of the International. In this regard the language of Article 14 of the International Constitution does recognize various aspects of the relationship, including strike funds, payment of strike benefits, duration of strike permission, etc., but also recognizes that there should be a vote at

-8-

the Local level in order to have a strike declaration by the local. The Constitution goes on to indicate that even in the event a strike is voted, the member involved "shall be under the jurisdiction of the Union in whose jurisdiction they are working." Members are subject to strike rules . . . by the Locals and the General Executive Board. As a result, . . . it is appropriate to conclude that the International and the Ohio Locals that are referred to as the "Union" in the contract involving Ohio Local 294-G is an "Other Labor Organization" . . . . Thus, the employees by this contract are protected by Section 9 of Article 3.

*See* Dkt # 14, Arbitration Op. & Award at 10-19.

Finally, the arbitrator considered the issue of whether cancelling health benefits rose to the level of a prohibited disciplinary action within the meaning of Article 3, Section 9, which protects employees who elect not to cross the picket lines of "other labor organizations." The employer argued that its conduct was not discipline, simply a "withholding of something not earned and an attempt to finance a strike," *id.* at 20, in the same sense that union members did not earn their salary by electing not to work. The arbitrator agreed it was not discipline, but otherwise concluded:

> However, the language goes on to speak of 'discipline of any kind' which suggests the broadest definition of the term. Nonetheless, based on this record, *I am not persuaded* that the term "discipline of any kind" encompasses the cancellation of health care benefits. However, while perhaps not discipline, the withholding of such benefits is extremely coercive and . . . a violation of the agreement.

*Ibid.* (emphasis added). As a result of his analysis the arbitrator affirmed the defendants' grievance, stating "[a]ll adversely affected employees must be made whole for all losses and expenses, including out-of-pocket expenses incurred during any period when health care benefits were suspended." *Ibid.*

The Michigan Sugar Company filed the instant action on January 11, 2006 seeking to vacate the arbitration award. Thereafter, the defendants filed a counterclaim and answer asking the Court to enforce the award. This Court's predecessor referred the matter for general case management to Magistrate Judge Charles E. Binder on January 30, 2006. The parties then filed cross-motions for

-9-

summary judgment.

The magistrate judge held oral argument on August 28, 2006 and issued a report and recommendation on October 20, 2006.  In his report, the magistrate judge wrote that "[s]ince the instant CBA did not address the topic of health insurance in the context of strikes, I suggest that the arbitrator did not amend or add terms to an unambiguous provision" of that agreement.  R & R at 6.  The magistrate judge noted that the arbitrator drew his conclusion by relying on paragraph b of Section 4 of Article 14 of the collective bargaining agreement.  Although the magistrate judge found that the arbitrator's reading of the collective bargaining "could be viewed as strained, there is support for his logic." *Id.* at 7.  Specifically, the magistrate judge reasoned:

> At least on [sic] decision affirmed an analysis that parallels the arbitrator's decision. *Although the arbitrator did not use the phrase "unlawful discrimination," his conclusion could be viewed as a finding that such discrimination occurred.* When an employer treats employees differently before striking than after striking, unlawful discrimination under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158 (a)(1, 3), has occurred.

> In the instant case, the arbitrator found that since health insurance benefits are provided for 30 days to employees that are fired, "it logically follows that the circumstances the current grievants found themselves in qualified for at least a continuation of insurance for 30 days." (Dkt. 14, Ex. A, Op. & Award at 15.) Similarly, in *NLRB v. Swift Adhesives*, 110 F.3d 632 (8th Cir. 1997), the court held that the employer's denial of accrued vacation benefits to striking employees was discriminatory because, "[h]ad the employees quit, been fired, or died before the strike, they would have been entitled to their vacation pay." *Id.* at 634. *Accord N.L.R.B. v. Frick Co.*, 397 F.2d 956, 961 (6th Cir. 1968) (finding discrimination where employer "refused to pay vacation benefits to the strikers who were absent from work because of the strike when such benefits were paid to other employees"); *N.L.R.B v. Great Dane Trailers, Inc.*, 388 U.S. 26, 32 (1967) (finding discrimination where "[s]ome employees who met the conditions specified in the expired collective bargaining agreement were paid accrued vacation benefits in the amounts set forth in that agreement, while other employees who also met the conditions but who had engaged in protected concerted activity were denied such benefits"). The Court's reasoning closely parallels that of the arbitrator in the instant case: treating striking employees in a manner less generous than fired employees sounds in discrimination.

-10-

R & R at 7-8 (emphasis added).

The magistrate judge, however, departed from the arbitrator's analysis in one respect. He suggested that Michigan Sugar, at the very least, should not have made the unilateral decision to terminate health care benefits without offering the striking employees the chance to pay for continued coverage at their own cost.  In reaching this conclusion, the magistrate judge drew from provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. § 1162 (requiring an employer to "extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following . . . (ii) the date which is 18 months after the date of the qualifying event").  Case law, he noted, supported the idea that a strike was qualifying event and that notice of the election to continue benefits must be given to striking employees under COBRA.  *See Communications Workers of America, District One, AFL-CIO v. NYEX Corp*, 898 F.2d 887, 888 (2d Cir. 1990) (enjoining the employer from to give proper notice of the right to continuation of benefits and from actually providing the option for continuation of coverage because the striking employees were entitled to choose continuation of medical coverage under COBRA); *see also Nat'l Labor Relations Bd. v. Beverly Health & Rehabilitation Srvs*, 349 N.L.R.B (BNA) No. 111, Case No 6-CA-2876 (May 8, 2006) (noting that under the employer's policy of allowing employees on unpaid leave of absence to continue health care coverage at their expense, the employer's unilateral choice to deduct the health care expense premiums for striking employees without  "first giving notice and bargaining with the Union" "violated the Act").

Consequently, the magistrate judge concluded:

Therefore, although the arbitrator may have given credence to the grievance for the reasons differing from the analysis above, I conclude that the arbitrator's decision

-11-

nonetheless be upheld as one consistent with his authority and the statutory requirements of COBRA. I therefore suggest that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

R & R at 11.

On November 3, 2006, the plaintiff filed objections to the report and recommendation to which the defendants have responded. The matter is now before the Court on a *de novo* review in light of the parties' submissions.

II.

A.

This Court reviews a report and recommendation of a magistrate judge *de novo*. *See* 28 U.S.C. § 636. The magistrate judge considered cross motions for summary judgment, and therefore this Court applies the same standard.

Summary judgment under Federal Rule of Civil Procedure 56 is a particularly useful method of reviewing an arbitrator's decision construing the terms of a collective bargaining agreement because "the sole question at issue [is] a question of law," and the underlying material facts are not in dispute. *United States v. Donovan*, 348 F.3d 509, 511 (6th Cir. 2003); *see also Wachovia Bank v. Watters*, 431 F.3d 556, 559 (6th Cir. 2005); *Progressive Corp. &Subsidiaries v. United States*, 970 F.2d 188, 190-91 (6th Cir. 1992). Thus, in this case, the Court's role is to determine whether judgment as a matter of law is appropriate for either party in light of the standard of review prescribed by Labor Management Relations Act, and interpreting case law, of an arbitration award.

B.

The Labor Management Relations Act (LMRA), 29 U.S.C. § 185(c), empowers federal courts to enforce collective bargaining agreements. As the Supreme Court has explained, the LRMA

-12-

states a "decided preference for private settlement of labor disputes" as opposed to court resolution. *United Paper Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). Thus, it well-established that disputes arising under a collective bargaining agreement may be resolved through arbitration where the collective bargaining agreement so provides, as here. *Ibid.* It is similarly well-settled that this Court has the power under the LMRA to review an arbitration award and vacate or enforce it as necessary. *See, e.g., Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local 24*, 357 F.3d 546, 556 (6th Cir. 2004) (reasoning that "[t]his Court's jurisdiction to review an arbitrator's decision is predicated on an allegation that the arbitrator reached an erroneous decision").

Because of the statutory presumption favoring private settlement of labor disputes, however, substantial deference is given to an arbitrator's decision. *DMB Techs. Inc. v. Local 227, UFCW*, 257 F.3d 651, 656 (6th Cir. 2001). In fact, the Sixth Circuit "has called our review over such arbitration awards one of the narrowest standards of judicial review in all of American jurisprudence." *Ibid.* (internal citation and quotations omitted). Stated otherwise, "when a collective bargaining agreement provides for a private mechanism of arbitrating a dispute, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Ibid.*

Of course, the arbitrator "may not ignore the plain language of the agreement; . . .[b]ut as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error will not suffice to overturn his decision." *Misco*, 484 U.S. at 38. To be sure, an award is vulnerable when the "language of the contract at hand is sufficiently clear as to deny the arbitrator the authority to interpret the agreement as he did." *Bruce Hardwood Floors v. S. Council of Indus. Workers*, 8 F.3d

1104, 1108 (6th Cir. 1993).   The Sixth Circuit has articulated the following standard for reviewing

an arbitrator's decision:

> If the arbitrator's award "draws its essence from the bargaining agreement," and is
> not merely the arbitrator's "own brand of industrial justice," the award is legitimate.
> An arbitrator's award fails to draw its essence from the agreement when: (1) it
> conflicts with express terms of the agreement; (2) it imposes additional requirements
> not expressly provided for in the agreement; (3) it is not rationally supported by or
> derived from the agreement; or (4) it is based on "general considerations of fairness
> and equity" instead of the exact terms of the agreement.

*Sterling China*, 357 F.3d at 556 (internal citation omitted).   Thus, the focus of the inquiry is on the

language of the collective bargaining agreement itself.

III.

A.

Michigan Sugar first objects to the magistrate judge's use of COBRA and case law under the

LMRA to support his conclusion that arbitrator's decision should be upheld.   The Court agrees that

magistrate judge  was unjustified in looking to these sources in making his recommendation.

As noted, the magistrate judge reasoned that the company, at the very least, should not have

made the unilateral decision to suspend health care benefits without first providing COBRA notices

to employees who refused to cross the picket lines that they could continue their benefits at their

own cost.  *See* R & R at 11; 29 U.S.C. § 1162 (requiring an employer to "extend for at least the

period beginning on the date of the qualifying event and ending not earlier than the earliest of the

following . . . (ii) the date which is 18 months after the date of the qualifying event").

*Communications Workers of America,* 898 F.2d at  888 (finding that a strike is a qualifying event).

The problem with this suggestion is twofold: the arbitrator specifically found that Michigan Sugar

complied with the notice provisions of that statute, *see* Arbitration Op. & Award at 4; and as the

-14-

parties clarified at oral argument, Michigan Sugar properly informed its employees of their COBRA protections.

Nor should the magistrate judge have justified his conclusion by citation to case law involving collective bargaining agreements not at issue in this case. The magistrate judge reasoned that, although the arbitrator's decision was "strained" in his view, other courts had upheld an arbitration award based on similar analysis. *See Swift Adhesives*, 110 F.3d at 634 (holding that the employer's denial of accrued vacation benefits to striking employees was discriminatory because, "[h]ad the employees quit, been fired, or died before the strike, they would have been entitled to their vacation pay"); *see also Frick Co.*, 397 F.2d at 961 (6th Cir. 1968) (finding discrimination where the employer "refused to pay vacation benefits to the strikers who were absent from work because of the strike when such benefits were paid to other employees"); *Great Dane Trailers, Inc.*, 388 U.S. at 32 (finding discrimination where "[s]ome employees who met the conditions specified in the expired collective bargaining agreement were paid accrued vacation benefits in the amounts set forth in that agreement, while other employees who also met the conditions but who had engaged in protected concerted activity were denied such benefits").

However, the standard of review for arbitrator's decision is explicitly based on the language of the collective bargaining agreement and the arbitrator's construction of that document. *See DMB Techs*, 257 F.3d at 656 (stating "when a collective bargaining agreement provides for a private mechanism for arbitrating a dispute, it is the arbitrator's view of the facts and the meaning of the document that they have agreed to accept"); *Sterling China*, 357 F.3d at 556 (couching this Court's standard of review in the following terms:  If the arbitrator's award "draws its essence from the bargaining agreement, and is not merely the arbitrator's own brand of industrial justice, the award

is legitimate. An arbitrator's award fails to draw its essence from the agreement when: (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement") (internal quotations and citation omitted).

Thus, the magistrate judge was required to review the arbitrator's award not in terms of how other courts have viewed different collective bargaining agreements under circumstances unique to those cases, but in light of the plain language of the agreement at issue in this case.

### B.

The ultimate issues for resolution in this case have been made somewhat simpler by the clarifications the parties made during oral argument. First, Michigan Sugar concedes that it is not seeking review of the arbitrator's conclusion that the International and Ohio local were "other labor organizations" for purposes of Article 3, Section 9(b). As quoted above, that provision prohibits Michigan Sugar from "discharg[ing] or [taking] discipline of any kind" against employees if they "walk though or cross in any manner" a picket line set up by "(another) labor organization." Dkt # 17, CBA at 7.

Second, the defendants concede that they have not sought review of another crucial aspect of the arbitrator's decision. By its terms, the protection afforded by Article 3, Section 9(b) prohibits only "discharge or discipline of any kind." However, the arbitrator found that the suspension of health benefits did not amount to discipline. *See id.* at 20 (stating "[h]owever, the language goes on to speak of 'discipline of any kind' which suggests the broadest definition of the term. Nonetheless, based on this record, I am not persuaded that the term 'discipline of any kind' encompasses the

-16-

cancellation of health care benefits"). At the hearing, the defendants explained that this conclusion is not being challenged before this Court.

Third, the defendants also admitted during oral argument that had the arbitrator found that the Michigan employees violated Article 13's "no strike, no lockout" provision, Michigan Sugar's suspension of health care benefits would have been an appropriate remedy under the collective bargaining agreement.

The Court therefore is left with a relatively narrow issue for review. The question becomes whether Article 14 of the collective bargaining agreement addressing insurance prohibits Michigan Sugar from suspending unearned health benefits to workers who do not report for work.

Michigan Sugar maintains the same position that is has throughout this litigation: the company has no duty to pay workers who do not report to work and no duty to finance a work cessation. Essentially, it reasons that the withholding of health benefits is equivalent to not paying workers when they fail to show up for work. Specifically, Michigan Sugar asserts that the arbitrator sought to reason from provisions of Article 14 that expressly do not apply to this situation. The Court is constrained to agree with the plaintiff.

The crux of the problem with the arbitrator's decision directly follows his conclusion that Michigan Sugar's suspension of health care benefits was not "discipline" within the meaning of Article 3, Section 9, but otherwise violates the collective bargaining agreement because he viewed it as "extremely coercive." He writes:

> There is an issue of whether cancelling health benefits is considered discipline. In the classic sense, the word "discipline", as it is used in this setting, is generally thought of as being a response to misconduct. The Employer suggests its action were not discipline, but in essence of withholding something not earned and an attempt not to help finance a strike. However, the language goes on to speak of 'discipline of any kind' which suggests the broadest definition of the term. Nonetheless, based on this

-17-

> record, I am not persuaded that the term "discipline of any kind" encompasses the cancellation of health care benefits.  However, while perhaps not discipline, the withholding of such benefits is extremely coercive, and as I have indicated, *a violation of the agreement.*

Arbitrator Op. & Award at 20 (emphasis added).  The arbitrator's statements, however, beg the question of what language in the collective bargaining agreement the plaintiff violated.

The arbitrator appears to base his conclusion on the view that workers who do not report to work because they do not wish to cross picket lines should be compensated since they should be treated no less favorably than those who are terminated without cause or commit more serious offenses than failing to show up to work such as physically assaulting a supervisor:

> [I]t would be entirely appropriate to conclude that even if the Employer's position regarding the scope of the language in Section 9 of Article 3 was correct, and even if the termination of health insurance was not considered discipline, the existence of the language in paragraph b of Section 4 of Article 14 expresses the mutual intent of the parties that employees will have a minimum of 30 days of paid health insurance under any circumstances that could arguably fall within the definition of termination of employment.
>
> Since that's the case, and it appears from the record that even an employee who engaged in severe misconduct, such as striking a supervisor or theft, it logically follows that the circumstances the current grievants found themself in, qualified for at least a continuation of insurance for 30 days.  Some have suggested that the language in question prohibits a termination of insurance until that point that employees suffer a classic termination of employment such as a discharge, and thus insurance coverage fro the grievants should continue indefinitely because there has been no termination of employment.  However, given the totality of the circumstances and the contract language, I am not prepared to reach that conclusion.  The grievants are still employees even though they have honored the picket lines in question.  Employees, such as the grievants, are entitled to health insurance coverage.  Absent contract language, the Employer may have had the right to withhold the benefit.  However, Section 4 of the Article 14 redefines the relationship regarding the termination of this benefit.  Based on this record, I am persuaded that intent of the parties, as expressed by the language in question, established that individuals who engage in the activity the grievants have in this case fall within the protection of paragraph b of Section 4 of Article 14.

*Id.* at 15-16.  Thus, the arbitrator's conclusion is premised on two things: that "termination" can be

-18-

read broadly to encompass employees who do not show up to work to avoid crossing a picket line; and Article 14, Section 4 somehow redefines the employee-employer relationship to permit such a broad reading of that term.

The Court cannot agree with this analysis. The language in Article 14, Section 4(b) is unambiguous; it addresses "Termination of Employment." The employees in this case were not terminated. They returned to work after the intermittent work stoppage. Instead, the arbitrator's broad reading of the word "termination" is derived from the following reasoning:

> One of those provisions . . . is Section 4 of Article 14 - <u>Insurance</u>.
>
> [T]o quickly summarize, it establishes that if a regular employee is laid off, the Employer will assume the cost of the benefit for a six-month period. At the end of six months the employee can pay for the insurance through the group plan. The second paragraph, and the one most pertinent to this dispute, concerns "termination of employment." The language provides that except in circumstances involving a "normal layoff or retirement with pension," an employee's hospitalization, etc, shall be cancelled in 30 days unless it is continued under paragraph c of Section 2. As I read [that provision] it does not apply to this dispute. However, the language dealing with the continuation of insurance for a 30-day period, and that's how I construe it, does, in my view, have application in this dispute. The term "termination of employment" can be construed narrowly to mean discharge, resignation of employment or other events which lead to the classically understood termination of employment which completely severs all aspects of the employee/employer relationship. However, it could also be interpreted in a broader sense to mean that employees who are not working, but yet have some relationship with the Employer, will not have their coverage cancelled until 30 days have passed. . . . I assume . . . that even if an individual were terminated for cause, their insurance would continue for at least 30 days. There are other provisions of the agreement which speak of insurance, but they generally do so in relation to specific concerns . . . .[T]here is no specific reference to termination of insurance.

*Id.* at 14-15.

The arbitrator makes no reference to the source of his "interpretation" in the collective bargaining agreement. In the Court's view, however, this reading of an unambiguous provision of the collective bargaining agreement fails to "draw its essence from the bargaining agreement" and

-19-

constitutes "the arbitrator's own brand of industrial justice." *Sterling China*, 357 F.3d at 556.

Importantly, the arbitrator ignores a key provision of the agreement. Article 2 expresses the company's reservation of rights: "The company shall retain all rights, powers, and authority it had prior to entering into this Agreement, including, but not limited to the sole right to manage its business and direct the working force, subject *only* to such regulations governing the exercise of these rights as are expressly provided in this Agreement." CBA at 4 (emphasis added). Thus, absent any provision prohibiting the employer from suspending health care benefits that have not yet been earned by employees, such remedy is permissible under the agreement.

Plainly, had the arbitrator (or the defendants challenged on review) concluded that the employees were disciplined in violation of Article 3, Section 9, the result would have been different. Indeed, the aggrieved employees would have the right to maintain an action at law or in equity against Michigan Sugar for redress of their injuries. *See* CBA at 7. However, the arbitrator did not make a finding that discipline occurred. Because the arbitrator's conclusion was based on a provision of the collective bargaining agreement that clearly has no application in this situation, Article 14, and his personal conclusion that Michigan Sugar's activity was "extremely coercive" and thus violated the collective bargaining agreement, the Court believes that both the arbitrator and the magistrate judge reached the incorrect result.

IV.

After conducting a *de novo* review of the entire record in light of the parties' submissions and hearing argument in open court, the Court finds that the magistrate judge's conclusions were in error.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation is

-20-

**REJECTED**, the plaintiff's objections [dkt # 30] are **SUSTAINED**, the plaintiff's motion for summary judgment [dkt # 14] is **GRANTED**, the defendants' motion for summary judgment [dkt # 22] is **DENIED**, and the arbitration award is **VACATED**.

It is further **ORDERED** that the defendants shall reimburse the plaintiff with respect to the payments for suspended health care benefits the plaintiff made in accordance with the arbitrator's decision.

It is further **ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 26, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 26, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS

---

-21-